[See Case No. 16,615.]

## Case No. 16,617.

### UNITED STATES v. The VENUS.

[See Case No. 16,914.]

## Case No. 16,618.

### UNITED STATES v. VERMILYE et al.

[10 Blatchf. 280; 1  6 Am. Law T. Rep. 78.]

Circuit Court, S. D. New York.  Dec. 27, 1872. 2

NEGOTIABLE INSTRUMENTS—UNITED STATES "SEVEN-THIRTY NOTES"—RESTRICTION OF NEGOTIABILITY—BAILMENT—RIGHTS OF CARRIER.

1. An obligation of the United States, commonly called a "seven-thirty note," issued under the act of March 3, 1865 (13 Stat. 468), payable to the order of         , and not having the name of any person filled into such blank space, is in the same condition as if payable to bearer, and is, therefore, negotiable by delivery.

2. The writing of anything on the back of such note, while such blank is not filled up with the name of a payee, does not amount to an endorsement on, or of, such note, in the sense of that word, in the law merchant, so as to restrict the negotiability of the note, or to make it non-negotiable by delivery merely.

3. A person who purchases such a note after its maturity, and after the time for its conversion into bonds has passed, takes nothing but the actual right and title of his vendor.

4. Such a note is not money, but is only evidence of the indebtedness of the United States for money borrowed.

5. A carrier of such a note, for hire, has such a special property in it, that, if it be stolen from him, and be found in the possession of a person who took it after maturity, and who shows no better title to it than the title of the thief, the carrier may recover it from such person, by action.

6. The carrier, on paying the value of the note to his bailor, becomes the equitable assignee of the title of the bailor to the note.

[This was a bill of interpleader filed by the United States against Washington R. Vermilye and others, composing the firm of Vermilye & Co., and the Adams Express Company.]

---

1[Reported by Hon. William Cranch, Chief Judge.]

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
2 [Affirmed in 21 Wall. (88 U. S.) 138.]

Clarence A. Seward and Charles M. Da Costa, for the express company.

John E. Burrill, for Vermilye & Co.

BLATCHFORD, District Judge. The bill in this case sets forth, that the defendants Vermilye & Co. claim to own five of the obligations of the United States, known as "seven-thirty notes," for $1,000 each, issued June 15th, 1865, and three of such notes, for $100 each, issued July 15th, 1865; that such eight notes were sent by Vermilye & Co. to the plaintiffs, for payment or redemption, Vermilye & Co. claiming that they purchased said notes in good faith and for a valuable consideration, without notice or suspicion that the seller was not the owner thereof; that the defendant the Adams Express Company likewise claims to be the owner of all of said notes, and that the same were stolen from it about May 22d, 1868, and that it never parted with the title to the same; that each of such claimants has notified the plaintiffs not to pay or deliver the notes to the other; that the plaintiffs have always been willing to deliver the notes, and to pay the moneys secured thereby, to the person lawfully entitled to receive the same; that they offer to deliver the same into this court; and that they do not collude with either claimant, and have not brought this suit at the request of either or both, and have not been indemnified by either or both. The prayer of the bill is, that the defendants may interplead and settle their rights to the notes, and to the money secured thereby, and that the plaintiffs may be at liberty to deliver the notes to this court, and that the defendants may be enjoined from commencing any suit against the plaintiffs, touching the premises, and that the plaintiffs, upon the payment into court of such amount, and procuring the defendants to interplead, may be discharged of all liability to the defendants in the premises.

The answer of Vermilye & Co. avers their ownership of the notes, and denies that the Adams Express Company has any interest in, or title to, them. It avers, that the notes were purchased and received by them in the ordinary course of business, at their banking house in the city of New York; that, at the time of said purchase, they paid therefor the full value of the notes in said city; that they so purchased and paid for the same in good faith, and without any knowledge or notice that the parties from whom the same were purchased were not the owners thereof and lawfully entitled to the same, and in the full belief that said persons were such owners and so entitled; that they forwarded the notes to the secretary of the treasury, at Washington, for redemption and payment, the notes having then become due, and for no other purpose; that it was the duty of the plaintiffs to have redeemed and paid the notes to them, or to have returned them to them; and that they demanded a return of them from the plaintiffs, before the commencement of this suit. The answer asks that the court will adjudge that Vermilye & Co. are the owners of the notes, and entitled to recover and receive the same, or the amount due thereon.

The answer of the Adams Express Company denies the ownership of Vermilye & Co., and that they purchased the notes in good faith, and for a valuable consideration, without notice or suspicion that the seller was not the owner thereof. It sets up ownership in the company, and avers that the company is a carrier and forwarder of money packages for hire; that it was so, in May, 1868, between New Albany, in Indiana, and the city of New York; that, on the 19th of May, 1868, the First National Bank, at New Albany, Indiana, owned one of the $1,000 notes; that, on that day, and at that place, its cashier endorsed said note as follows: "Pay secretary of the treasury, for redemption. W. Mann, Cas.," or, "Pay secretary of the treasury, for conversion. W. Mann, Cas.;" that the note, so endorsed, was placed and secured in an envelope, which was addressed to the secretary of the treasury of the United States, at Washington; that, on the same day, the package containing the note was delivered to the company, for transportation by it to its address; that, while the package was in the possession of the company, as carrier, it was feloniously, and with force and arms, taken from the possession of the company, by some unknown persons, not through any negligence of the company; that the note subsequently appeared in circulation, but not bearing, with legible distinctness, such endorsement, but yet bearing traces of it sufficiently legible to indicate to any one conversant with such notes, that its negotiability had been restricted by an endorsement which had been attempted to be obliterated; that the fact of such attempted obliteration was and is plainly perceptible on the note, and was the cause of the refusal of the secretary of the treasury, in the first instance, to redeem or convert it; and that the company has fully paid the bank for the note, and is entitled to its possession, and to be paid the amount due on it. The answer prays for a decree to that effect. It also sets up, that, on the 21st of May, 1868, the First National Bank of Clarksville, Tennessee, was the owner, in its own right, or as depositary, of the other seven notes; that those notes, endorsed by its cashier, or their owners, were securely enveloped and addressed to B. Seaman, Cashier, New York, and the package was delivered to the company, for transportation to New York; that such package was feloniously taken from the custody of the company, at the same time, and under the same circumstances, with the package from New Albany; that the endorsements on the notes were attempted to be obliterated in the same manner, and to the same extent, and no more, as in the case of the note from New Albany, and they

came to Vermilye & Co. in the same manner as that note; and that the company has fully paid the Clarksville Bank for the notes, and is entitled to their possession, and to the amount due thereon. It prays for a decree to that effect. It also avers, that Vermilye & Co.. prior to receiving the notes, were notified by the company of the fact of such larceny, and were furnished by it with the numbers of the notes, and of the series thereof, and were fully notified thereby, and also by the appearance of the notes, that the same had lost their negotiable character, and were tainted, in their title thereto, in the hands of those who passed them to Vermilye & Co.; and that, if Vermilye & Co. parted with value for the notes, they did so in violation of the notices given to them by the company, of its property in the notes, and without the exercise of ordinary care and scrutiny, and with full knowledge, from the appearance of the notes, that they had been tampered with.

This case was brought to hearing, on the pleadings, in July, 1870, and a decree was then made, to the effect, that the bill is properly filed; that the defendants do interplead and settle the matters in controversy herein between themselves; that, in the meantime, and until the further order of the court, the notes in controversy be deposited with the clerk of this court; that the costs of the United States be paid by the party in whose favor judgment final shall be entered herein; and that the consideration of all questions of costs as between the defendants, and all other questions and directions, be reserved until the trial of the matters in controversy between the defendants.

The notes in question were all of them issued under the authority of the act of March 3, 1865 (13 Stat. 468). They all of them bear on their faces the words: "Act of March 3d, 1865." The New Albany note, one for $1,000, and the four Clarksville notes for $1,000 each, bear date June 15th, 1865. The other three Clarksville notes, for $100 each, bear date July 15th, 1865. The $1,000 notes read, on their faces, in this way, in engraving: "Interest twenty cents per day. Three years after date, the United States promise to pay to the order of          one thousand dollars, with interest, at 7³/₁₀ per cent., payable semi-annually, in lawful money. Washington, June 15th, 1865. Treasury Department. Act of March 3d, 1865." They also bear the signatures, on their faces, of the register of the treasury and of the treasurer of the United States. On the face of each are the words, in engraving: "5 coupons attached. Last 6 months' interest payable with note. Prior instalments payable only on presentation of coupons therefor;" also, the words, in engraving: "The government reserves the right of paying, in coin, the interest on this note, at the rate of six per cent. per annum." On the back of each note are the words, in engraving: "Pay to bearer," in a panel, with a blank space underneath, in the panel, in which words could be written.

On the back of each note are, also, the words, in engraving: "At maturity, convertible, at the option of the holder, into bonds redeemable, at the pleasure of the government, at any time after five years, and payable twenty years from June 15th, 1868, with interest at six per cent. per annum, payable semi-annually, in coin." The $100 notes differ from the $1,000 notes, only in having the words "two cents," instead of "twenty cents," the words "one hundred" instead of "one thousand," and the words "July 15th," instead of "June 15th."

The fact of the larceny of the notes from the possession of the express company and their ownership by the banks, as set up, is fully proved. They were stolen during the night of the 22d of May, 1868, out of a railroad car, the iron safe, in which they were. being taken away, with its contents. after the messenger in charge of it had been knocked senseless by the robbers. On the 29th of May, 1868, a printed handbill, advising of the stealing of the New Albany note, as a United States 7-30 note for $1,000, second series, act of March 3, 1865, and giving its number, was delivered to a person behind the counter of Vermilye & Co., in their office in New York. This handbill cautioned all persons against receiving or negotiating the note, and stated that the express company claimed the right to recover its possession, and that it was endorsed, "Pay secretary of the treasury for redemption. W. Mann, Cashier." The handbill purported to be issued by the president of the express company, and was dated New York, May 28th, 1868. On the 5th of June, 1868, another printed handbill, dated Cincinnati, May 28th, 1868, advising of the stealing of the New Albany note, as a United States 7-30 note for $1,000, second series, issued under the act of March 3, 1865, and endorsed as before mentioned, and giving its number, and of the four $1,000 Clarksville notes, as United States 7-30 bonds, of $1,000 each, June 15th, and giving their numbers and letters, and of the three $100 Clarksville notes, as United States 7-30 bonds, of $100 each, dated July 15th, 1865, and giving their numbers and letters, was delivered to a person behind the counter of Vermilye & Co., in their office in New York. This handbill purported to be issued by officers of the express company, and contained a like caution and statement as before mentioned, in regard to the notes specified in it.

On the 22d of June, 1868, the treasury department issued a circular limiting the time for the conversion of the seven-thirty notes into bonds, but not extending the time during which the notes not presented for conversion would draw interest, beyond the date of their maturity. The time for the conversion of the notes maturing June 15th, 1868, was extended to and including July 15th, 1868, and the time for the conversion of the notes maturing July 15th, 1868, was extended to and including August 1st. 1868. The bonds to be issued in exchange for the notes were to bear inter-

est from July 1st, 1868, and the interest on the notes surrendered in exchange was to be calculated accordingly.

In July, 1868, the Adams Express Company filed in the treasury department a caveat, consisting of the before named handbill dated Cincinnati, May 28th, 1868. It was delivered to the department, with a letter from the office of the company at New York, dated July 20th, 1868, to its agent at Washington, which letter requested the agent to have the notes mentioned in the handbill, caveated at the department. They were caveated, by entering, in a book in the department, under proper heads, the fact that they were seven-thirties, and their dates of issue, numbers, and amounts, with the fact that they were "stopped," and the name of the company as the person filing the caveat.

In June and July, 1868, the company paid to the two banks, respectively, the entire value of the stolen notes. The notes, when stolen, and when they came into the possession of Vermilye & Co., did not have the name of any person filled into the blank spaces on their faces, after the words, "order of." The New Albany note had, when stolen, written across its back, one or the other of the two forms of words set forth in the answer of the company in that behalf. There is no satisfactory evidence that any thing was written on the back of any of the Clarksville notes.

On the 9th of April, 1869, Vermilye & Co. purchased, at their office, from Suydam & Nason, a reputable firm, members of the New York Stock Exchange, the New Albany note and the four $1,000 Clarksville notes, paying therefor a sum calculated at the rate of 99½ per cent. on the principal, with the addition of the six months' unpaid interest on such principal. On the 12th of April, 1869, Vermilye & Co. made a like purchase, from the same firm, for a like price, of the other three Clarksville notes.

On the 14th of April, 1869, Vermilye & Co. presented the eight notes at the treasury department for redemption. They were not redeemed. In reply, the department informed Vermilye & Co. that the notes were all of them claimed by the Adams Express Company, and, further, in regard to the five $1,000 notes, that their general appearance warranted the belief "that the payee's name had been extracted from the face of the notes."

It is in evidence, that it was usual for seventy-thirty notes to be bought and sold in the market after their maturity, and after, by such maturity, interest had ceased to be payable on them; and that the notes in question were purchased by Vermilye & Co. in the usual mode in which such transactions were conducted. No mala fides can be imputed to Vermilye & Co. in respect of the purchases, except such as may grow out of the facts that they purchased the notes so long after their maturity, that the handbills referred to were delivered to them, and that the notes, some or all, bore appearances which, as to some of

the notes, attracted the notice of the officers of the treasury department, on their finding that the notes were notes which had been caveated on their books.

There is no evidence as to what was visible on the faces or backs of the notes, when they were received by Vermilye & Co., or by the treasury department, in respect to written matter partially obliterated, except the remark, in the letter of the department, of April 14th, 1869, to Vermilye & Co., in regard to the five $1,000 notes, that "the general appearance of the notes warrants the belief that the payee's name has been extracted from the face of the notes." As it is not shown or claimed, that the name of any payee was ever inserted in the blank on the face of any of the notes, this remark has no meaning. In the absence of the insertion of any names in such blanks, the notes were all of them in the same condition as if payable to bearer, and were, therefore, negotiable by delivery; and the writing of anything on the backs of the notes, while the blanks after the words "order of" were not filled up with the names of payees, did not amount to an "endorsement" on, or of, the notes, in the sense of that word, in the law merchant, so as to restrict the negotiability of the notes, or to make them non-negotiable by delivery merely. Wookey v. Pole, 4 Barn. & Ald. 1; White v. Vermont & M. R. Co., 21 How. [62 U. S.] 575; Mercer Co. v. Hackett, 1 Wall. [68 U. S.] 83; Murray v. Lardner, 2 Wall. [69 U. S.] 110; Sanders v. Bacon, 8 Johns. 485; Tappan v. Ely, 15 Wend. 362. And these doctrines apply to these notes issued by the United States, in like manner as if they were the notes or bonds of a corporation or of an individual. Texas v. White, 7 Wall. [74 U. S.] 700; Texas v. Hardenberg, 10 Wall. [77 U. S.] 68. But, while Vermilye & Co., if they purchased these notes in good faith, before their maturity, without notice of any defect of title in the sellers, might be protected, and be held to have acquired the title to the notes, yet a very different question is presented, when it appears, as it does, that the notes were all of them purchased after their maturity. When they were so purchased, the time for their conversion into bonds had long passed. They were then merely overdue obligations, payable in lawful money. A person who takes a bill or note, which, on the face of it, is overdue, cannot claim the privileges which belong to a bona fide holder without notice; and, if he chooses to receive it under such circumstances, he takes it with all the infirmities belonging to it, and is in no better condition than the person from whom he received it, and takes nothing but the actual right and title of his vendor. Andrews v. Pond, 13 Pet. [38 U. S.] 65. 79; Goodman v. Simonds, 20 How. [61 U. S.] 343, 365, 366; Texas v. White, 7 Wall. [74 U. S.] 700, 735; Texas v. Hardenberg, 10 Wall. [77 U. S.] 68, 90. The last two cases cited show that these

doctrines apply to securities issued by the United States. In Texas v. White [supra], the court say, that the known usage of the United States to pay all bonds as soon as the right of payment accrues, requires the application of the rule respecting overdue obligations to bonds of the United States which have become redeemable. The right to convert into bonds the seven-thirty notes which matured June 15th, 1868, expired July 15th, 1868, and the right to convert into bonds the notes which matured July 15th, 1868, expired August 1st, 1868. The notes, therefore, after those dates, remained, in the hands of any holder of them, good only for the principal secured by them, and for unpaid interest up to the date of their maturity, as expressed on their face. The holder of them was losing interest on his money by holding them. He could use them only for what their value was, principal and interest, at their maturity. They were thus, in fact, less valuable to their holder than an ordinary promissory note of a solvent maker would have been, after its maturity. This condition of these notes is shown by the fact that Vermilye paid for them one-half of one per cent. less than their principal, with the addition of the unpaid interest up to maturity. The fact that they continued to be bought and sold after their maturity, and after interest had ceased on them, did not make them any the less overdue obligations, or relieve them from the operation of the rules of law in regard to such obligations. Vermilye & Co. still took the risk of the title of the vendor. There may have been many reasons, in respect to particular notes, why they passed in the market after maturity, and why the interest on the money represented by them was being lost to the holder. It does not necessarily follow that all of such notes had been stolen, so as to establish such usage as a usage to deal in stolen notes after maturity, even if such usage could be of any force. We have no evidence of the extent of the dealing in such notes after maturity, as compared with the entire amount of the notes issued. With the known usage of the government to pay its obligations at maturity, and the loss of interest, and the rejection of the privilege of conversion, all of which facts were apparent to Vermilye & Co. by inspection of the notes, there is every reason for holding them to the rule, that they took nothing but the actual right and title of their vendor. That was nothing but the title of the thief. No principle applicable to the protection of those who deal in negotiable securities before their maturity, requires that these notes, in the position they occupied after their maturity, should be regarded as other than overdue obligations. Mr. Trowbridge, one of the defendants, who negotiated the purchase of the notes in question, testifies, that, when he bought them, he knew they were past due. They had been past due from nine to ten months. In connection with this fact, it is not inapt to remark, that, whatever may be said in regard to holding a party bound by such notice as was given to Vermilye & Co., in this case, in respect to dealing in government securities such as these notes, before their maturity, it is not at all unreasonable to regard such notice given June 5th, 1868, in respect to securities which would become, and which became, due, some June 15th, 1868, and the rest July 15th, 1868, as a good notice in respect to dealing in the particular securities named in the notice, after they became overdue.

There is no force in the suggestion, that the notes in question were a part of the currency of the country, and were money, in the same sense as bank notes. They were issued under the act of March 3, 1865 (13 Stat. 468), and so state on their faces. The 3d section of that act expressly provides, that nothing contained in that act shall be "construed as authorizing the issuing of legal tender notes in any form," although a previous part of the 3d section had provided that all the provisions of the act of June 30, 1864 (13 Stat. 218), which were applicable to the obligations to be issued under the act of 1865, should apply to them. The reason for this evidently was, that the 2d section of the act of 1864 provided, that certain seven-thirty notes, authorized by it, and to be made payable, principal and interest, in lawful money, at maturity, not exceeding three years from date, should be a legal tender to the same extent as United States notes, for their face value, excluding interest; and it was intended that the seven-thirty notes to be issued under the act of 1865 should not be a legal tender. The first section of the act of 1865 shows that the seven-thirty notes issued under that act were only evidences of the indebtedness of the United States for money borrowed by it.

It is objected, on the part of Vermilye & Co., that the express company has no title to, or interest in, the notes, other than that which arises from its having paid the amounts of the notes to the banks, and that there is no evidence of any transfer to the company of the titles of the banks, or of any other person, to the notes. The company had these notes in its possession, as a carrier for hire. In virtue of that relation, it had such a special property in them, that it could maintain an action to recover them, against the thief. If so, no good reason is perceived why it could not also maintain an action to recover them against Vermilye & Co., if they were found in the hands of Vermilye & Co., after having been taken by the latter under the circumstances shown in this case. This being so, the company ought to be allowed to rely on such special property, as against Vermilye & Co., when it is shown that Vermilye & Co. have no better title than the thief who stole the notes from the company. The company was clearly liable to the bailors for the

loss of the notes; and, when it is shown, in addition to such special property of the company, that it has paid the value of the notes to the bailors, in discharge of such liability, it must be held, that, in equity, there has been an assignment to the company of all the title of the bailors to the notes. The facts proved are sufficient to establish the right of the company, as against Vermilye & Co., to receive payment of the notes from the United States, and to protect the United States in paying the notes to the company.

There must be a decree in favor of the express company.

[The case was taken on appeal to the supreme court, where the decree of the circuit court was affirmed. 21 Wall. (88 U. S.) 138.]